1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JONATHAN WILBANKS,                    No.  2:21-cv-0026 KJM CSK P

12                 Plaintiff,

13        v.                               FINDINGS & RECOMMENDATIONS

14   T. TAPPAN,                            (ECF No. 58)

15                 Defendant.

16

17

18   I.  INTRODUCTION

19        Plaintiff Jonathan Wilbanks is a state prisoner proceeding pro se.  Defendant T. Tappan's

20   fully briefed motion for summary judgment is before the Court. (ECF Nos. 58, 59, 62-65.)  As

21   discussed below, defendant's motion should be granted.

22   II.  SECOND AMENDED COMPLAINT

23        In his verified Second Amended Complaint ("SAC"), plaintiff alleges that on July 3,

24   2018, at California State Prison, Sacramento ("CSP-SAC"), defendant T. Tappan,[1] a correctional

25   officer who worked the observation tower of C yard, shot plaintiff three times with mini-14

26   rounds, all with direct hits.  (ECF No. 16 at 3.)  Plaintiff alleges that the first shot was to his left

27   ───────────────

28   [1]  Though plaintiff identifies the defendant as "T. Tappen," the correct spelling of defendant's last
     name is "Tappan."  (ECF No. 48 at 7 n.1.)

                                        1

1    shoulder, the second shot went through his face, and the third shot was to the top of his head.

2    (Id.)  Plaintiff claims such excessive force violated his Eighth Amendment rights.  Plaintiff

3    sustained permanent physical disabilities, including loss of vision, metal shrapnel lodged in his

4    rotator cuff, fractured teeth, facial reconstruction surgeries, and he is unable to properly breathe

5    through his nostrils, and suffers PTSD and mental torment from the incident.  (ECF No. 16 at 3.)[2]

6    III.  LEGAL STANDARDS

7         A.  Legal Standard for Summary Judgment

8             Summary judgment is appropriate when it is demonstrated that the standard set forth in

9    Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

10   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

11   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

16   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

17   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

18   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

19   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

20   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

---

[2]  Plaintiff's Second Amended Complaint named various other defendants and raised additional
Eighth Amendment claims.  (ECF No. 16.)  On June 29, 2021, the assigned magistrate judge
recommended that the additional defendants and claims be dismissed.  (ECF No. 20.)  The district
court adopted the findings and recommendations in full on December 8, 2021, but granted
plaintiff leave to amend to pursue his Eighth Amendment medical claims against Dr. Yee.  (ECF
No. 31.)  On January 18, 2022, plaintiff was granted thirty days to file a motion to amend to
include his claims as to Dr. Yee, or to voluntarily dismiss such claims and pursue them in a
separate action.  (ECF No. 35.)  Plaintiff did not respond.  On March 10, 2022, the magistrate
judge recommended that plaintiff's putative claims against Dr. Yee be dismissed without
prejudice.  (ECF No. 37.)  On May 23, 2022, the district court adopted the findings and
recommendations in full and dismissed without prejudice plaintiff's putative claims against Dr.
Yee.  (ECF No. 38.)  Thus, Correctional Officer T. Tappan is the sole remaining defendant.

committee notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By notice issued January 12, 2024, plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 58-2 (citing Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).)

B.  Legal Standard for Eighth Amendment Claim Alleging Excessive Force

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

When determining whether the force was excessive, the court looks to the "extent of injury suffered by an inmate . . ., the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'"  Id. at 7 (quoting Whitley v.

4

1    Albers, 475 U.S. 312, 321 (1986)).  While de minimis uses of physical force generally do not

2    implicate the Eighth Amendment, significant injury need not be evident in the context of an

3    excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to

4    cause harm, contemporary standards of decency always are violated."  Id. at 9.

5         C.  Legal Standard for Qualified Immunity

6         "The doctrine of qualified immunity protects government officials 'from liability for civil

7    damages insofar as their conduct does not violate clearly established statutory or constitutional

8    rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223,

9    231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity

10   shields an officer from liability even if his or her action resulted from "'a mistake of law, a

11   mistake of fact, or a mistake based on mixed questions of law and fact.'"  Id. (quoting Groh v.

12   Ramirez, 540 U.S. 551, 567 (2004)).

13        "Determining whether officials are owed qualified immunity involves two inquiries:

14   (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged

15   show the official's conduct violated a constitutional right; and (2) if so, whether the right was

16   clearly established in light of the specific context of the case."  Robinson v. York, 566 F.3d 817,

17   821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v.

18   Callahan, 555 U.S. 223, 236 (2009) (the two factors set out in Saucier need not be considered in

19   sequence.)).  A right is "clearly established" when, "at the time of the challenged conduct, the

20   contours of a right are sufficiently clear that every reasonable official would have understood that

21   what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting

22   Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

23        The qualified immunity analysis is separate from the Eighth Amendment excessive force

24   analysis.  See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003).  Thus, a guard can do an

25   act which would violate an inmate's Eighth Amendment right but still be entitled to qualified

26   immunity if a reasonable officer in his position would have believed that his response was a good

27   faith effort to restore discipline.  Id. at 692-93; Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043,

28   1053 (9th Cir. 2002) (the existence of triable issues of fact as to whether prison officials were

1   deliberately indifferent does not necessarily preclude qualified immunity.).  Courts must be

2   "hesitant 'to critique in hindsight decisions necessarily made in haste, under pressure, and

3   frequently without the luxury of a second chance.'"  Marquez, 322 F.3d at 692 (quoting Whitley,

4   475 U.S. at 320).

5       D.  Video Evidence

6       Defendant submitted video evidence in support of his motion for summary judgment.

7   (ECF No. 65-1.)  The Supreme Court stated that when ruling on motions for summary judgment,

8   courts "should [ ] view[ ] the facts in the light depicted by the videotape."  Scott v. Harris, 550

9   U.S. 372, 380-81 (2007) (following review of videotape, Court held deputy acted reasonably in

10  terminating car chase and did not violate respondent's Fourth Amendment right against

11  unreasonable seizure).  However, courts are still required to draw all reasonable inferences in the

12  nonmovant's favor.  Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The

13  record is viewed in the light most favorable to the nonmovants . . . so long as their version of the

14  facts is not blatantly contradicted by the video evidence."); Williams v. Las Vegas Metro. Police

15  Dep't, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not

16  change the usual rules of summary judgment:  in general, the court will draw all reasonable

17  inferences from the video in plaintiff's favor") (citing Blankenhorn v. City of Orange, 485 F.3d

18  463, 468 n.1 (9th Cir. 2007)).  Thus, the Court considers the video footage, drawing all

19  reasonable inferences in plaintiff's favor.

20  IV.  FACTS

21   A.  Undisputed Facts

22       For purposes of summary judgment, the undersigned finds the following facts are

23  undisputed.  Where plaintiff failed to address defendant's assertion of a fact as undisputed, which

24  plaintiff was required to address, this Court considers the fact undisputed.  See Fed. R. Civ. P.

25  56(e)(2).

26       1.  At all relevant times, plaintiff Jonathan Wilbanks was in the custody of the California

27  Department of Corrections and Rehabilitation ("CDCR") at CSP-SAC.  SAC at 2 (ECF No. 16);

28

Declaration of J. Lompa (counsel for defendant) ("Lompa Decl.") ⁋ 2, Ex. A (ECF No. 58-3); Plaintiff's Deposition ("Pl. Dep.") 13:2-11 (ECF No. 58-3 at 7).

2. At all relevant times, defendant Tappan was employed by the CDCR as a correctional officer at CSP-SAC. Declaration of defendant T. Tappan ("Tappan Decl.") ⁋ 2 (ECF No. 58-5).

3. In the afternoon of July 3, 2018, defendant Tappan was stationed at C Observation on Facility C Main Yard when inmates plaintiff Jonathan Wilbanks (AS-1955), Jose Juarez (F-55194), Octavio Castillo (AM-4962), Jaime Patino (AA-8037), and Israel Dinnocenzo (AU-2727) began running from the upper basketball court area down toward the softball field. Tappan Decl. ⁋ 3.

4. Inmate Dinnocenzo was running away from plaintiff and the three inmates when plaintiff and inmate Juarez caught up with Dinnocenzo near the third base line on the Facility C Main Yard softball field, and an attack on inmate Dinnocenzo began. Tappan Decl. ⁋ 3.

5. Plaintiff admits he had an inmate manufactured knife on him at the time of the attack. Pl. Dep. 49:8-17 & Ex. B (photo of plaintiff's weapon) (ECF No. 58-3 at 16, 30).

6. Plaintiff admits he was attempting to stab inmate Dinnocenzo.[3] Pl. Dep. 44:7.

7. A shot hit the ground away from plaintiff, Juarez, and Dinnocenzo. (Camera 10 at 1:41:22.470 PM; Camera 1 at 1:41:22.470 PM.) No one was hit by this shot, and plaintiff and Juarez continued to attack Dinnocenzo after this shot. (*Id.*)

8. Plaintiff was shot by defendant Tappan.[4] Plaintiff's Declaration ("Pl. Decl.") at 2-3; Tappan Decl. ⁋⁋ 6, 8, 9; Declaration of Correctional Officer J. Roswell ("Roswell Decl.") ⁋ 8

---

[3] Plaintiff denies he stabbed Dinnocenzo and denies he was holding the weapon in his left hand because he is right handed. However, the Court finds such disputes are not material because it is undisputed plaintiff was in possession of a weapon and attempted to stab Dinnocenzo.

[4] In his verified SAC, plaintiff alleges that he was shot three times: first to his left shoulder, then through his face, and then to the top of his head. (ECF No. 16 at 3.) In his current declaration, plaintiff claims he was shot twice: defendant's first shot hit plaintiff in the left shoulder, and defendant's third shot entered through plaintiff's white hat and exited through his face as you see the hat flying off his head. Pl. Decl. at 3. Defendant maintains plaintiff was shot once. Tappan Decl. ⁋⁋ 6, 8, 9; Roswell Decl. ⁋ 8; Diaz Decl. ⁋ 8. The UC Davis Health medical record, under the "History of Present Illness" section, noted that "[t]he bullet entered the right nares, traversed

(ECF No. 58-4); Declaration of Retired Lt. John "Tony" Diaz ("Diaz Decl.") ¶ 8 (ECF No. 59); Lompa Decl. ¶ 3, Ex. B.

9. Inmate Juarez continued attacking Dinnocenzo after plaintiff was shot by Tappan. Tappan Decl. ¶ 10; Roswell Decl. ¶ 9.

10. The entire incident involving plaintiff and inmates Juarez and Dinnocenzo happened very quickly. Tappan Decl. ¶ 10 (in less than one minute); Pl. Dep. at 86:19 ("it was all so quick.").

11. Inmate Dinnocenzo survived the attack. Tappan Decl. ¶ 11.

12. Plaintiff was wearing a blue shirt and a white hat. Pl. Decl. at 1, 3; Tappan Decl. ¶ 3. Inmate Dinnocenzo was wearing no shirt and gray shorts. Tappan Decl. ¶ 3. Inmate Juarez was wearing a gray shirt. Id.

13. Plaintiff sustained critical injuries, including "severely comminuted left orbital blowout fracture, maxillary sinus fracture extending into the hard palate, commuted ZMC fracture, nasal septal fracture, nasal orbital ethmoid fracture extending to the body of the sphenoid bone, and mildly displaced left coracoid process fracture," for which plaintiff required surgery. Lompa Decl. Ex. B at 00091. At the time of his surgical critical care consult, it was reported plaintiff had lost one to two liters of blood on scene and was admitted to the intensive care unit for "ventilator management and hemodynamic monitoring." Id.

14. Plaintiff admits that from defendant Tappan's point of view, Tappan had a right to be concerned that plaintiff and Juarez were going to kill Dinnocenzo. Pl. Dep. at 59:21-24.

15. Plaintiff admits he attacked Dinnocenzo with the goal of removing him from the general population yard, and plaintiff was willing to risk his life to accomplish his goal. Pl. Dep. at 51:21-54:22.

16. Plaintiff received a Rules Violation Report ("RVR") for fighting on July 3, 2018, related to the altercation with inmate Dinnocenzo. Tappan Decl. ¶ 14; Pl. Dep. at 17:8-15; Lompa Decl. ¶ 4, Ex. C.

---

the maxillary sinus, and entered his left shoulder." Lompa Decl. ¶ 3, Ex. B (ECF No. 58-3 at 42, 47). Plaintiff does not accept this version of how he was shot. Pl. Dep. at 45:8-13; 47:4-18.

17.  Plaintiff pleaded not guilty to the RVR, and he declined to make any statement at his hearing other than his plea was "not guilty."  Tappan Decl. ℙ 14; Pl. Dep. at 17:8-15; Lompa Decl. ℙ 4, Ex. C.

18.  Plaintiff was found guilty after the RVR hearing.  Tappan Decl. ℙ 14; Pl. Dep. at 17:8-15; Lompa Decl. ℙ 4, Ex. C.

19.  Plaintiff did not know defendant Tappan prior to the shooting, and there is no evidence of any ill will or animosity between Tappan and plaintiff prior to the shooting.  Pl. Dep. at 82-83.

B.  <u>Disputed Facts</u>

The following facts are disputed.

*1.  Defendant's Version*

Defendant Tappan saw a flat shiny object protruding approximately eight inches out of plaintiff's left hand, while making downward stabbing motions to the torso of inmate Dinnocenzo.  Tappan Decl. ℙ 4.  Defendant Tappan ordered the inmates on the yard down to the ground using the public address system with negative results.  Tappan Decl. ℙ 4; Roswell Decl. ℙ 3; Diaz Decl. ℙ 5.  Defendant Tappan witnessed plaintiff and inmate Juarez continue their violent attack on inmate Dinnocenzo, by making stabbing motions to the torso area, and as inmate Dinnocenzo fell to the ground, defendant Tappan observed plaintiff and inmate Juarez continue their violent attack by bending over at the waist making downward stabbing motions to Dinnocenzo's torso.  Tappan Decl. ℙ 5; Roswell Decl. ℙℙ 3, 4; Diaz Decl. ℙ 5.  Defendant Tappan continued to perceive plaintiff holding the shiny metal object in his left hand.  Tappan Decl. ℙ 5; Roswell Decl. ℙ 3.

Tappan and other responding staff continued to verbally order the involved inmates to get down on the ground.  Tappan Decl. ℙ 5.  Fearing great bodily injury or the imminent death of inmate Dinnocenzo, defendant Tappan fired one .223 round from his Ruger Mini 14 as a warning shot, aiming at the dirt area approximately five feet to the left, and behind the incident area; the round struck the intended target with negative effects.  Tappan Decl. ℙ 6; Roswell Decl. ℙ 5; Diaz Decl. ℙ 5.  Defendant Tappan observed that plaintiff and inmate Juarez continued their violent

9

attack on inmate Dinnocenzo, and perceived plaintiff raising his left arm above his head making downward stabbing motions with a shiny object Tappan believed to be a weapon toward Dinnocenzo's torso area.  Tappan Decl. ⁋ 6; Roswell Decl. ⁋ 5.

Officer Roswell, C Yard Officer #1 on the day of the incident, heard C Facility Observation announce over the PA system, "Get down."  Roswell Decl. ⁋ 3.  Roswell observed what he believed to be four inmates, later identified as inmates Patino, Castillo, Juarez and plaintiff chasing another inmate, later identified as inmate Dinnocenzo, toward the third base area of the softball field.  Roswell Decl. ⁋ 3; Diaz Decl. ⁋ 6.  Roswell observed the inmates striking Dinnocenzo, and observed plaintiff use an inmate manufactured weapon in his left hand strike inmate Dinnocenzo in a stabbing motion.  Roswell Decl. ⁋ 3; Diaz Decl. ⁋ 6.  Officer Roswell responded to the incident area and he, along with other yard staff, ordered the involved inmates to stop fighting and to get down; plaintiff and inmate Juarez did not stop after the orders.  Roswell Decl. ⁋ 4; Tappan Decl. ⁋ 7.  Defendant Tappan observed that "[p]laintiff and inmate Juarez continued striking inmate Dinnocenzo with downward stabbing motions to the upper torso."  Tappan Decl. ⁋ 7.  Officer Roswell saw that "[p]laintiff and inmate Juarez continued to strike inmate Dinnocenzo in the face and upper torso with a closed fist in a stabbing motion."  Roswell Decl. ⁋ 4.

Fearing great bodily injury or death was imminent to inmate Dinnocenzo, defendant Tappan fired a second .223 round warning shot, aiming at the dirt area five feet to the right of the incident and struck its intended target with a negative effect.  Tappan Decl. ⁋ 8; Roswell Decl. ⁋ 6; Diaz Decl. ⁋ 6.  Defendant Tappan saw plaintiff continuing his attack by raising his left hand with a shiny object above his head and stabbing in a downward direction toward inmate Dinnocenzo's torso area.  Tappan Decl. ⁋ 8.

From a distance of approximately 20 feet away from the combatant inmates, nonparty Officer Roswell deployed a 1040 Blast Dispersion Grenade which detonated approximately one foot in front of the combatants with negative results.  Roswell Decl. ⁋ 7; Tappan Decl. ⁋ 7; Diaz Decl. ⁋⁋ 6, 7.  Officer Roswell and defendant Tappan observed several other responding officers deploy 1040 Blast Dispersion Grenades from a distance of 16-25 feet which detonated within one

1   to three feet in front of the combatants with negative results.  Roswell Decl. ⁋ 7; Tappan Decl.

2   ⁋ 7; Diaz Decl. ⁋⁋ 6, 7.  It was not safe for responding staff to move closer to the combative

3   inmates due to the imminent risk of injury or death to staff.  Roswell Decl. ⁋ 7; Diaz Decl. ⁋ 6.

4         After these measures, defendant Tappan and Officer Roswell observed inmate

5   Juarez and plaintiff continue their attack on inmate Dinnocenzo.  Tappan Decl. ⁋ 8; Roswell Decl.

6   ⁋ 7.  Defendant Tappan observed a "plethora" of blood on inmate Dinnocenzo's upper torso area.

7   Tappan Decl. ⁋ 8.  Fearing great bodily injury or death, and with less lethal measures and orders

8   to stop the attack not being effective, defendant Tappan fired a third .223 round for effect at a

9   distance of approximately 120 feet, aiming at plaintiff's upper chest and he struck plaintiff, the

10  intended target.  Tappan Decl. ⁋⁋ 8, 9; Roswell Decl. ⁋ 8; Diaz Decl. ⁋ 8.  Defendant Tappan "did

11  not see where the round struck, but . . . saw plaintiff immediately stop striking inmate

12  Dinnocenzo, and roll backwards onto his left side."  Tappan Decl. ⁋ 9.  Officer Roswell

13  "observed the round make impact with plaintiff's left facial area, after which plaintiff fell to the

14  ground in a prone position."  Roswell Decl. ⁋ 8.

15        However, inmate Juarez continued the attack, which resulted in additional uses of force

16  against Juarez by other responding officers.  Tappan Decl. ⁋ 10; Roswell Decl. ⁋ 9.

17        *2.  Plaintiff's Version*

18        Contrary to his allegations in his second amended complaint that he was shot three times

19  (ECF No. 16 at 3), plaintiff now declares that he was shot twice by defendant Tappan.  Pl. Decl.

20  at 2-3.  Plaintiff claims that Tappan's first warning shot struck plaintiff in the shoulder, at which

21  point plaintiff fell to the ground.  Pl. Decl. at 2.  Plaintiff contends that while plaintiff was on the

22  ground, Tappan's third round entered plaintiff's hat and exited through his face.  Pl. Decl. at 3.

23  Plaintiff denies he began striking Dinnocenzo, and denies he was holding the weapon in his left

24  hand because he is right handed.  Pl. Decl. at 2.  Despite plaintiff's admitted attempts to stab

25  Dinnocenzo, plaintiff denies that he stabbed him.[5]  Id.; Pl. Dep. at 43:23.  Plaintiff contends that

26

27  _____
    [5] In his deposition, plaintiff explained that two weapons were found at the scene, an ice pick and

28  a flat one, "[a]nd according to the medical body chart of the victim, none of those puncture

1    the third shot by Tappan was excessive because plaintiff was on the ground and no longer posed a

2    threat.  Pl. Dep. at 48:4-7.

3    V.  DISCUSSION

4         A.  Failure to Comply with Local Rule 260

5              Defendant argues that he is entitled to summary judgment because plaintiff's filing in

6    opposition to defendant's motion for summary judgment (ECF No. 63) fails to comply with Local

7    Rule 260(b), which requires that a party opposing a motion for summary judgment "shall

8    reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are

9    undisputed and deny those that are disputed, including with each denial a citation to the particular

10   portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other

11   document relied upon in support of that denial."  Defendant filed a statement of undisputed facts

12   as required by Local Rule 260(a).  (ECF No. 58-1.)  Defendant argues that while plaintiff's

13   declaration references Statement of Undisputed Facts Nos. 1-7, plaintiff's references do not

14   correspond to defendant's Statement of Undisputed Facts; plaintiff did not reproduce defendant's

15   Statement of Undisputed Facts as required by Local Rule; and plaintiff's declaration is based on

16   plaintiff's "own opinions and inadmissible hearsay."  (ECF No. 65 at 3.)  Defendant argues that

17   the Court should disregard plaintiff's declaration.[6]  (Id.)

18             Defendant is correct that the only document plaintiff filed in opposition to the motion is

19   plaintiff's declaration, and the declaration was not accompanied by a reproduction of defendant's

20   Statement of Undisputed Facts with plaintiff's responses, as required by Local Rule 260(b).

21   (ECF No. 63.)

22             "Pro se litigants must follow the same rules of procedure that govern other litigants."

23   King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds,

24

25   wounds are consistent with a flat, the weapon that [plaintiff] had."  Pl. Dep. at 43:24-44:4.
     However, plaintiff did not submit the victim's medical chart as evidence.

26

27   [6] Defendant also makes a hearsay argument based on plaintiff's failure to provide the videos in
     an admissible form.  Given that defendant did submit the videos in an admissible form, the Court
28   rejects this argument.

                                                    12

1    Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).  However, the Ninth

2    Circuit instructs district courts to "construe liberally motion papers and pleadings filed by pro se

3    inmates and should avoid applying summary judgment rules strictly."  Thomas v. Ponder, 611

4    F.3d 1144, 1150 (9th Cir. 2010).  Further, plaintiff's failure to comply with Local Rule 260(b) is

5    not a concession to defendant and is not grounds alone to grant defendant's motion for summary

6    judgment.  See Martinez v. Stanford, 323 F.3d 1178, 1182 (9th Cir. 2003) ("A motion for

7    summary judgment cannot be granted simply because the opposing party violated a local rule. . .

8    .") (citations omitted).  In addition, plaintiff's second amended complaint is verified and may also

9    serve as his affidavit in opposition to the motion for summary judgment.  See Lopez v. Smith,

10   203 F.3d 1122, 1132 n.14 (9th Cir. 2000).

11          Accordingly, the Court considers the record before it in its entirety despite plaintiff's

12   failure to comply with the applicable rules.  However, only those assertions in plaintiff's

13   declaration that are based on his personal knowledge or have evidentiary support in the record are

14   considered.  In light of plaintiff's pro se status, the Court reviewed plaintiff's filing in an effort to

15   discern whether he denies any material fact asserted in defendant's statement of undisputed

16   facts.[7]

17       B.  The Video Evidence

18          Defendant previously produced in discovery to plaintiff video evidence of the underlying

19   incident, which defendant submitted in support of his motion for summary judgment:  video from

20   camera C Yard PTZ 13 (file titled "7-3-18 PTZ 13.xpa"); video from cameras 10 and 1 (file titled

21   "7-3-18 CAM 10 AND 1.xpa" simultaneously shows two different videos labeled "C Yard Cam

22   1" and "C Yard Cam 1"); and video from cameras 2, 5, and 8 (file titled "7-3-18 CAM 2, 5, AND

23   8.xpa" simultaneously shows three different videos labeled "C Yard Cam 5," "C Yard Cam 8,"

24   and "C Yard Cam 2").  (See ECF No. 65-1.)  Each video includes identification of the camera in

25

26   [7] On February 6, 2024, defendant filed a notice of errata clarifying that the motion contained an
     inadvertent typographical error and should read "TO THE COURT AND TO PLAINTIFF

27   JOHNATHAN WILBANKS," rather than to JONATHAN TAPPEN.  (ECF No. 64 at 1, citing
     ECF No. 58 at 1:22.)  In his declaration, plaintiff objected that his name was never "Jonathan

28   Tappen."  Pl. Decl. at 3.  No further court action is required.

the top left corner (e.g., camera "C Yard PTZ 13"); the date "7/3/2018" in the bottom left corner; a running time stamp in the bottom center (e.g., "1:41:43.343 PM"), and a running counter in the top right corner.  Each video is taken from a different vantage point of the C Yard at CSP-SAC.

Plaintiff also relies on the video evidence in his opposition to summary judgment, and contends that the video evidence supports his version of what happened.  (ECF No. 63.) Specifically, plaintiff claims that he was hit by defendant Tappan's first shot which went through plaintiff's shoulder, and he immediately fell to the ground.  Pl. Dep. at 45:19-21, 86:9-14. Plaintiff estimated that the time lapse from when plaintiff caught up with Dinnocenzo and the time plaintiff was first shot and proned out was probably "three or four seconds."  Pl. Dep. at 87:10-13.  Plaintiff claims he saw Tappan's second warning shot fire a few feet away from plaintiff "connect with the dirt."  Pl. Dep. at 45:21-22.  Plaintiff declares that defendant's third shot struck plaintiff while he was on the ground, entering through his white hat and exiting through his face.  Pl. Dep. at 45:23-25, 47:2-3.  Plaintiff points to where "you clearly see [his] hat flying, like, five feet in the air."  Pl. Dep. at 45:23-25.  Plaintiff maintains the force used was excessive because when Tappan shot plaintiff through the face, plaintiff was on the ground and no longer a threat.  Pl. Dep. at 48:2-9.

Defendant Tappan declares that only his third round struck plaintiff, although defendant did not see where it struck, but did see plaintiff "immediately stop striking inmate Dinnocenzo and roll backwards onto his left side."  Tappan Decl. ¶ 9.  Non-party Roswell observed plaintiff continue fighting after defendant Tappan's first two warning shots, and Roswell observed defendant Tappan's third round strike plaintiff's "left facial area, after which plaintiff fell to the ground in a prone position."  Roswell Decl. ¶ 8.  Defendant's expert reviewed the videos, plaintiff's medical records, and all other materials in support of the motion, and agrees that plaintiff continued fighting after Tappan's first two warning rounds, and plaintiff was only struck by the third round deployed by Tappan, after which plaintiff immediately ceased his attack.  Diaz Decl. ¶¶ 7-8.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of

14

1  the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380-83

2  (holding petitioner deputy entitled to summary judgment based on qualified immunity because

3  video evidence showed respondent's reckless driving in effort to evade arrest which discredited

4  respondent's claim that innocent bystanders were subject to little or no actual threat).

5        Here, the video footage confirms that the nature of this attack required immediate action

6  and contradicts plaintiff's version of the facts.  On the C Yard of CSP-SAC, plaintiff and three

7  other inmates began chasing another inmate (Dinnocenzo) toward the third base of the softball

8  field while numerous other inmates were recreating on the yard.  (Camera PTZ 13 at 1:40:59.678

9  PM.)  Plaintiff caught up to inmate Dinnocenzo first and started attacking him, bringing

10  Dinnocenzo to the ground.  (Camera 10 at 1:41:10.802 PM; Camera 1 at 1:41:11.144 PM.)  A

11  shot hit the ground away from the fighting inmates, kicking up dust but not smoke.  (Camera 10

12  at 1:41:22.470 PM; Camera 1 at 1:41:22.470 PM.)  The video evidence contradicts plaintiff's

13  version, i.e., that plaintiff was struck by Tappan's first shot and then fell to the ground after this

14  shot.  The videos confirm that no one was hit by this shot, because after this shot, plaintiff and

15  Juarez continued to attack Dinnocenzo while standing.  (Camera 10 at 1:41:22.470 - 1:41-27.306

16  PM; Camera 1 at 1:41:22.470 - 1:41:26.760 PM.)

17        While plaintiff and Juarez continued their attack, the third assailant and other inmates in

18  the C Yard sat down.  (Camera 10 at 1:41:23.796 PM.)  As the attack continued, Dinnocenzo was

19  on the ground with both plaintiff and Juarez also on the ground on top of Dinnocenzo.  (Camera

20  PTZ 13 at 1:41:32.126 - 1:41:34.061 PM.)  Numerous grenades shot by correctional officers

21  deployed smoke, often obscuring the view.  At 1:41:46.478 PM from Camera PTZ 13, plaintiff

22  was still sitting upright on the ground and involved in the attack, and was not laying on the

23  ground.  At 1:41:47.243 PM on Camera PTZ 13, plaintiff started to lean back from his seated

24  position, falling towards the ground.  By 1:41:49:754 PM on Camera PTZ 13, plaintiff was laying

25  on his side and no longer attacking the victim.  Both sides agree that after plaintiff was struck by

26  Tappan's shot, plaintiff went to the ground.  See Tappan Decl. ¶ 9; Pl. Dep. at 60:1-4.  From the

27  time plaintiff and Juarez starting chasing Dinnocenzo to when plaintiff was lying on the ground

28  after being shot, less than 50 seconds elapsed.  (See Camera PTZ 13 and Camera 10.)

1

2      Inmate Juarez continued to attack the victim, even after the officers formed a skirmish line

3   and began to administer pepper spray.  (Camera PTZ 13 at 1:41:49:754 - 1:42:27.382 PM)  Juarez

4   did not let the victim go until 1:42:58.083 PM on Camera PTZ 13, and the victim was finally

5   away from Juarez at approximately 1:42:59.081 PM on Camera PTZ 13.

6      Thus, the video footage confirms that plaintiff was attacking the victim, and not laying on

7   the ground, for at least 36 seconds. (Camera PTZ 13 from 1:41:10.583 to 1:41:47.243 PM.)  To

8   the extent plaintiff claims he was already laying on the ground at the time of Tappan's warning

9   shot, this claim is contradicted by the video which shows that after the warning shot, plaintiff

10  continued to attack the victim and was not laying on the ground.  (Camera 10 at 1:41:22.470 PM.)

11  Plaintiff was sitting upright on the ground attacking Dinnocenzo right before he started to fall

12  back to the ground.  (Camera PTZ 13 at 1:41:46.478 - 1:41:47.243 PM.)

13     In light of this video evidence, the Court cannot accept as true plaintiff's claim that he was

14  shot by Tappan's first shot.[8]

15     C.  Eighth Amendment

16     Plaintiff claims that defendant used excessive force in violation of the Eighth Amendment.

17  Defendant counters that the undisputed evidence establishes that defendant used force in a good

18  faith effort to restore order and ensure the safety of inmates and correctional staff.

19     As noted above, the Court must evaluate whether defendant's use of force was "applied in

20  a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"

21  by evaluating (1) the extent of any injury inflicted, (2) the need for the application of force,

22  (3) the relationship between that need and the amount of force used, (4) the threat reasonably

23

24  _____

25  [8]  It is unclear from the videos why plaintiff's hat came off his head after he was lying on the
    ground.  The videos show that there was a lot of activity happening simultaneously, including the

26  continued attack by Juarez on Dinnocenzo, and other uses of force were employed in an effort to
    stop Juarez's continued attack on Dinnocenzo.  (See Camera PTZ 13 at 1:42:25.541 PM,

27  1:42:48.286 PM, 1:42:55.509 PM, 1:42:56.585 PM & 1:42:58.348 PM (multiple 4557 foam baton
    rounds from 40 MM launchers) and Camera PTZ 13 at 1:42:26.820 - 1:42:48.582 (pepper spray

28  from skirmish line).)

16

1   perceived by the responsible officials, and (5) any efforts made to temper the severity of a

2   forceful response.  Hudson, 503 U.S. at 6-7.

3          First, the extent of plaintiff's injury is only one factor that may suggest whether the force

4   used was for the malicious and sadistic purpose of causing pain.  See Hudson, 503 U.S. at 6.  The

5   extent of a prisoner's injury is relevant but not determinative because a significant injury is not

6   required to state an excessive force claim (id.), while on the other hand, even deadly force can be

7   used in a good faith attempt to restore discipline.  Jeffers v. Gomez, 267 F.3d 895, 912 (2001)

8   (citing Whitley, 475 U.S. at 320).  In the instant case, it is undisputed that plaintiff sustained

9   critical injuries, including "severely comminuted left orbital blowout fracture, maxillary sinus

10  fracture extending into the hard palate, commuted ZMC fracture, nasal septal fracture, nasal

11  orbital ethmoid fracture extending to the body of the sphenoid bone, and mildly displaced left

12  coracoid process fracture," for which plaintiff required surgery.  UDF 38.  Thus, the extent of

13  plaintiff's injury weighs in favor of finding an Eighth Amendment violation.

14         Second, the use of force was necessary.  Plaintiff was attacking the victim for at least 36

15  seconds; the victim was unarmed; it is undisputed that Juarez and plaintiff were armed with

16  inmate manufactured weapons, and were both attacking the victim; and plaintiff only stopped

17  attacking the victim when plaintiff was hit by one of defendant Tappan's rounds.  The attack by

18  plaintiff and Juarez put Dinnocenzo's life at risk.  In addition, the attack was taking place on the

19  prison yard where the videos show at least 90 inmates who were unrestrained and might join in.

20  Further, in his deposition, plaintiff admitted he was attempting to stab Dinnocenzo; plaintiff's

21  goal was to get Dinnocenzo off the yard, and plaintiff was willing to die in his effort to do so.  Pl.

22  Dep. at 53:1-5; 53:21-54:8.  Under all of these circumstances, there was an "objective need for

23  force."  Marquez, 322 F.3d at 692.  This factor weighs against finding an Eighth Amendment

24  violation.

25         Third, as to the relationship between need and the force used, the force used was great;

26  plaintiff sustained gunshot wounds resulting in severe physical injuries.  Indeed, the weapon

27  deployed by Tappan (a rifle) could cause great bodily injury or death.  On the other hand, there

28  was a great need for force because two inmates were threatening the life of a third unarmed

inmate by attacking him with inmate made weapons.  Plaintiff and Juarez simultaneously attacked the victim for at least 36 seconds ignoring commands by Tappan and other officers to get down, and defendant Tappan saw a lot of blood on the victim.  These circumstances demonstrate a reasonable correctional officer would be concerned that the victim would suffer great bodily injury or death if force was not immediately applied to stop the attack.  In addition, defendant's expert concluded that the force used by Tappan comported with CDCR policy governing the use of deadly force.  Diaz Decl. ⁋ 11.  Specifically, Diaz opined that defendant Tappan's use of deadly force to stop plaintiff's attack of inmate Dinnocenzo was appropriate, reasonable, necessary and within CDCR use of force policy (Title 15, Section 3268, and DOM Section 51020), as verbal warnings, warning shots, and 1040 Blast Dispersion Grenades yielded negative results.  Diaz Decl. ⁋⁋ 6, 11.  The deadly force deployed in this incident was appropriate and would have been deemed reasonable by another officer with similar training and on the job experience.  Id.  Plaintiff provided no expert evidence to the contrary.  Further, plaintiff failed to address whether Tappan's application of force was necessary to stop the attack on Dinnocenzo, that the attack posed an imminent threat of great bodily injury or death to Dinnocenzo, or that Tappan's use of force did not violate CDCR policy.  This factor weighs against finding an Eighth Amendment violation.

Fourth, the perceived threat was also great.  Defendant Tappan assessed the attack by plaintiff and Juarez against Dinnocenzo to be an imminent threat to Dinnocenzo, requiring Tappan's immediate response to save inmate Dinnocenzo from great bodily injury or death and to restore order and ensure the safety of inmates and correctional staff.  Tappan Decl. ⁋⁋ 6, 8, 9, 12; Diaz Decl. ⁋⁋ 5-11, 13.  Dinnocenzo was defenseless, and it appeared he was being struck with weapons by plaintiff and inmate Juarez.  Tappan "observed blood that saturated across the chest and neck area of inmate Dinnocenzo."  Tappan Decl. ⁋ 5.  Defendant's expert also concluded that plaintiff posed an imminent threat to inmate Dinnocenzo, and defendant Tappan accurately perceived an imminent threat to inmate Dinnocenzo of great bodily injury or death.  Diaz Decl. ⁋ 11.  In his deposition, plaintiff admitted that from defendant Tappan's point of view, Tappan

had a right to be concerned that plaintiff and Juarez were going to kill Dinnocenzo.  Pl. Dep. at 59:21-24.  This factor weighs against finding an Eighth Amendment violation.

Fifth, defendant attempted to temper the severity of his response by first using other, less severe methods to stop plaintiff from attacking Dinnocenzo.  Defendant gave plaintiff, Juarez, and other inmates verbal commands over the public address system to go down to the ground.  Tappan Decl. ¶ 4.  Plaintiff and Juarez did not comply with Tappan's verbal commands.  Id.  Tappan also fired a warning shot striking the ground near the fighting inmates, but not striking plaintiff or Juarez, and this also did not stop plaintiff and Juarez's attack.  (Camera 10 at 1:41:22.470 PM; Camera 1 at 1:41:22.470 PM.)  Other officers also ordered plaintiff and Juarez to get down, without effect, and deployed numerous grenades that emitted smoke, also to no avail.  Tappan Decl. ¶ 7; Roswell ¶¶ 3, 6-7; (Camera 1 at 1:41:22.470 PM; 1:41:24.061 PM; 1:41:26.760 PM; 1:41:27.400 PM; 1:41:29.474 PM; 1:41:32.142 PM; 1:41:33.640 PM; 1:41:37.259 PM; 1:41:54.310 PM & 1:41:59.130 PM; and Camera PTZ 13 at 1:41:28.757 PM; 1:41:29.318 PM; 1:41:32.423 PM; 1:41:34.062 PM; 1:41:37.586 PM; & 1:41:53.748 PM).  Despite all of these efforts, plaintiff and Juarez continued attacking the victim.  Prison regulations provide that "[u]se of force options do not have to be utilized in any particular sequence but should be the force option staff reasonably believes is sufficient."  Cal. Code Regs. Tit. 15, § 3268(c).  Here, defendant Tappan chose the Ruger Mini-14, a rifle that could cause great bodily injury or death.[9]  Under the exigent circumstances presented here, deadly force was required to stop plaintiff from killing or inflicting great bodily injury on Dinnocenzo.  See, e.g., Whitley, 475 U.S. at 324 (prisoner's Eighth Amendment rights were not violated by being shot without prior verbal warning during efforts to stop a prison riot); Billups v. Ramirez, 2009 WL 1456641, *8 (E.D. Cal. May 22, 2009) (where fighting inmates did not stop fighting despite various efforts to stop them "(alarm, verbal orders, pepper spray, batons)," district court found defendants

---

[9]  Though plaintiff does not challenge Tappan's use of a rifle rather than another weapon, even if plaintiff had raised such a challenge, it would fail given the exigent circumstances, risk of Dinnocenzo's death, and the failure of less severe methods to stop plaintiff and Juarez's attack on Dinnocenzo, including verbal orders, firing a warning shot at the ground, and firing smoke grenades.

19

1   attempted to temper their use of force).  Plaintiff submitted no evidence that the force Tappan

2   used was more than necessary to stop plaintiff from attacking inmate Dinnocenzo under the

3   circumstances.  See Hudson, 503 U.S. at 7.  This factor weighs against finding an Eighth

4   Amendment violation.

5          Therefore, despite the weight of the first Hudson factor, the Court finds that the remaining

6   four factors weigh in favor of finding defendant Tappan applied force in a good faith effort to

7   prevent great bodily injury or death to inmate Dinnocenzo, restore order, and ensure the safety of

8   inmates and correctional staff.  Viewing the evidence in the light most favorable to plaintiff, no

9   reasonable fact finder could find that defendant Tappan applied such force maliciously and

10  sadistically to cause harm.  See Hudson, 503 U.S. at 7; Kropp v. Scott, 2019 WL 4601601, at *5

11  (N.D. Cal. Sept. 23, 2019) (finding use of force was objectively reasonable where "[i]t is

12  undisputed that it appeared to [defendant] that [victim of assault] was unconscious and

13  defenseless and was being hit in the head and torso repeatedly by [defendant] and [co-assailant]

14  for at least 47 seconds.  On this record, any reasonable trier of fact would find that [victim]

15  reasonably appeared to be at risk of great bodily injury or death.").

16      D.  Qualified Immunity

17         Though defendant argued that he is entitled to qualified immunity, plaintiff did not

18  address the issue of qualified immunity in plaintiff's declaration opposing summary judgment.

19  Rather, plaintiff contends that there are triable issues of fact that preclude summary judgment.

20  However, "[c]ourts may not simply stop with a determination that a triable issue of fact exists as

21  to whether prison officials [acted unconstitutionally]; instead, the qualified immunity inquiry is

22  separate from the constitutional inquiry."  Estate of Ford, 301 F.3d at 1053.  As discussed below,

23  the Court finds that defendant is entitled to qualified immunity.

24         The Court found above that defendant Tappan's use of force did not violate plaintiff's

25  constitutional rights, but even assuming that defendant Tappan violated plaintiff's constitutional

26  rights by Tappan's use of force, defendant is entitled to qualified immunity because there is no

27  evidence that defendant maliciously and sadistically used force on plaintiff.  A reasonable officer

28  in defendant's position would have believed that his response was taken in good faith to prevent

great bodily injury or death to Dinnocenzo, to restore order on the yard, and ensure the safety of inmates and correctional staff.  See Marquez, 322 F.3d at 693.  Multiple efforts were taken to stop the inmate attack, to no avail.  Indeed, multiple verbal warnings to get down, a warning shot striking the ground near plaintiff and Juarez, and multiple discharges of smoke grenades failed to stop plaintiff or Juarez in their attack on Dinnocenzo.  The videos show that plaintiff was attacking Dinnocenzo for at least 36 seconds before plaintiff fell to the ground from his seated position, likely from Tappan's gunshot, and Juarez continued the attack.  Defendant shot plaintiff in an attempt to stop plaintiff and Juarez's attack on Dinnocenzo, protect inmate Dinnocenzo from life-threatening harm, and to restore the safety and security of the prison yard that had dozens of unrestrained inmates.  Under these exigent circumstances, it would not have been clear to a reasonable officer that the actions taken by defendant were unlawful.  Further, on July 3, 2018, the date of this incident, it was clearly established that a correctional officer is allowed to use deadly force in a good faith effort to maintain or restore discipline.  Marquez, 322 F.3d at 692 (holding officer was entitled to qualified immunity because "a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful"); Jeffers, 267 F.3d at 910-11 (finding prison officials were entitled to qualified immunity where Jeffers was shot while being attacked by an inmate with a knife-like weapon, because the fact that the bullet struck Jeffers, the victim, instead of the attacker, amounted to "negligence or recklessness, at most").  Given the circumstances presented here, it would not have been clear to a reasonable officer that firing a Mini 14 round at the inmate attacking the victim with an inmate manufactured weapon, after other, less lethal efforts to stop the attack were unsuccessful, would violate the Constitution.  Rather, correctional officers have a constitutional obligation to protect inmates from attacks by other inmates.  See Jeffers, 267 F.3d at 917-18 (acknowledging prison officials have a duty to "protect prison employees, visitors, and the inmates themselves," which involves a "difficult balance.")  The Court finds that defendant Tappan should be entitled to qualified immunity.

///

///

1    VI.  CONCLUSION

2         Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary

3    judgment (ECF No. 58) be granted, defendant Tappan be granted qualified immunity, judgment

4    be entered in favor of defendant Tappan and this case be terminated.

5         These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10   objections shall be filed and served within fourteen days after service of the objections.  The

11   parties are advised that failure to file objections within the specified time may waive the right to

12   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13   Dated:  June 24, 2024

14                                              _____

15                                              CHI SOO KIM
                                                UNITED STATES MAGISTRATE JUDGE
16   /1/wilb0026.msj

17

18

19

20

21

22

23

24

25

26

27

28